**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

NAVCAN.DC, Inc. (previously known as Cascade Divide Data
Centers, Inc.), DACH Holdings, LLC, Silverstein Realty Group,
Inc., Silver Springs Development, Inc., GGH, Inc., and
Residencial de Chihuahua 2001, S.A. de C.V.

                                     Plaintiffs,

                   -against-

Jeffrey Rinde and CKR Law LLP,

                                  Defendants.

-----------------------------------------------------------------------X

:
:
:   **Case No.**
:
:
:
:   **COMPLAINT**
:
:
:   **JURY TRIAL**
:   **DEMANDED**
:
:
:

      Plaintiffs NAVCAN.DC, Inc. (previously known as Cascade Divide Data Centers, Inc.) ("NAVCAN/Cascade," or "Plaintiff A") DACH Holdings, LLC ("DACH," or "Plaintiff B"), Silverstein Realty Group, Inc. ("Silverstein," or "Plaintiff C"), Silver Springs Development, Inc. ("Silver Springs," or "Plaintiff D"), GGH, Inc. ("GGH," or "Plaintiff E,"), and Residencial de Chihuahua 2001, S.A. de C.V. ("Residencial" or "Plaintiff F," and collectively "Plaintiffs") by and through their undersigned counsel, bring this action for damages and other legal or equitable relief against Defendants Jeffrey Rinde ("Mr. Rinde") and CKR Law LLP ("CKR," and collectively, "Defendants"), and alleges as follows:

## I.    PARTIES

    1.    Plaintiff NAVCAN/Cascade is a business corporation duly authorized and existing under the laws of the state of Washington, with an address at 421 C Street, Washougal, WA 98761.

    2.    Plaintiff DACH is a business corporation duly authorized and existing under the laws of the State of Illinois, with an address at 146 W Higgins, Hoffman Estates, IL 60169.

3.    Plaintiff Silverstein is a business corporation duly authorized and existing under the laws of the State of Illinois, with an address at 540 Frontage Road, Suite 3145, Northfield, IL 60093.

4.    Plaintiff Silver Springs is a business corporation duly authorized and existing under the laws of the State of North Dakota, with an address at 202-402 21st Street East, Saskatoon, Saskatchewan, Canada, S7K OC3.

5.    Plaintiff GGH, Inc. is a business corporation duly authorized and existing under the laws of the State of Massachusetts, with an address at 319 Newburyport Turnpike, Suite 210, Rowley, MA 01969.

6.    Plaintiff Residencial is a business corporation duly authorized and existing under the laws of Mexico, with an address at Edificio Corporativo Roma, Perferico de la Juventud #6106-10, Fracc. Areadas C.P. 31215, Chihuahua, Chih, Mexico.

7.    Defendant Rinde is an individual who is a citizen of New York.

8.    Defendant CKR is a limited liability partnership duly authorized and existing under the laws of the State of California, with its principal office located at 1330 6th Avenue, New York, NY 10019.

## II.    JURISDICTION

9.    Pursuant to 28 U.S.C. § 1332(a) this Court has jurisdiction over this matter, as Plaintiffs and Defendants are citizens of Washington, Illinois, Canada, Massachusetts, Mexico, and, New York, respectively, and the amount in controversy is not less than four million twenty three thousand nine hundred fifty dollars ($4,023,950.00).

10.    Each of the Plaintiffs entered into an Escrow Agreement with Defendants that included an arbitration clause.

11.     Plaintiffs have each satisfied their obligation to arbitrate this dispute by initiating

an arbitration proceeding by filing a Statement of Claim at the American Arbitration Association

(the "AAA") on October 29, 2021 and proceeding with the arbitration until it was terminated by

the Panel as a result of Defendants' non-payment of arbitration fees, and Plaintiff's inability to

pay the significant fees owed by Defendants, on January 14, 2023.[1] *See Exhibit 1, AAA Statement*

*of Claim, and Exhibit 2, Termination Order.*

12.     This Court has held that an "'arbitration has been had' within the meaning of

Section 3 of the FAA when an arbitral panel has terminated the proceeding for failure to pay

without conducting further proceedings or granting an award." Cota v Art Brand Studios, LLC,

21-CV-1519 (LJL), 2021 WL 4864588, at *11 [SDNY Oct. 15, 2021] (Internal citations omitted).

13.     Thus, Plaintiffs have fulfilled their contractual obligation to arbitrate, the

completion of the arbitration proceeding was frustrated by Defendants' misconduct in that

proceeding, and Plaintiffs claims are properly before this Court.

### III.     STATEMENT OF FACTS

14.     Pursuant to Federal Rule of Civil Procedure 42, actions may be consolidated

when such actions involve a common question of law or fact. *See F.R.C.P. 42.*

15.     In the instant matter, each of the Plaintiffs engaged in identical transactions

governed by identical agreements with the same Defendants. Thus all questions of fact and law

at issue here are common to all of the Plaintiffs.

16.     Each of the Plaintiffs in this matter entered into virtually identical Escrow

Agreements with Defendants Rinde and CKR Law.

---

[1] Defendants' misconduct in continuously obstructing the arbitration proceeding, failing to comply with Panel Orders, and eventually withholding payment resulting in the termination of the arbitration proceeding, will be detailed herein.

17. Each of the Plaintiffs made a significant escrow payment to Defendants as consideration for a promised loan.

18. In order to induce them to enter into Escrow Agreements and make escrow payments to CKR, Mr. Rinde represented to each of the Plaintiffs that Defendants had successfully consummated numerous similarly-structured transactions, resulting in the counterparty to Defendants receiving significant promised funding.

19. Upon information and belief, Defendants, in fact, had solicited dozens of similarly-structured transactions, but had never consummated even a single one, and to date have failed to fund any similar transaction.

20. Mr. Rinde was aware of the falsity of the representation that he had successfully consummated similar transactions at the time he made the representation to each of the Plaintiffs over the course of almost five (5) years.[2]

21. Had Plaintiffs known that Mr. Rinde's representations were false, and that he had taken escrow funds from other investors and failed to fund their transactions, they obviously never would have entered into the Escrow Agreements with Defendants.

22. Each of the Plaintiffs executed an Escrow Agreement, whereby Defendants and a lessor agreed to procure a lease of a bank instrument ("BI") for the benefit of each Plaintiff in exchange for a fee of 11% of the face value of the BI. Each Plaintiff executed their respective Escrow Agreement with Defendants in reliance on the provisions therein and Defendants' representations.

---

[2] The first Plaintiff, NAVCAN/Cascade, entered into its Escrow Agreement with Defendants on October 29, 2015. Despite being fully aware that NAVCAN/Cascade had never received the funding it was promised as a result of its escrow payment to Defendants, Defendants continued to market the same transaction to each of the Plaintiffs, until the date Plaintiff Silverstein entered into an Escrow Agreement over four (4) years later on October 22, 2019.

23.     Each Escrow Agreement provided that each Plaintiff would make a partial, initial payment of four percent (4%) of the face value of the BI, into an escrow account under the control of Defendants.

24.     Each Escrow Agreement provided that Defendants were the designated Escrow Agent for the Escrow Payment, and agreed to receive, hold, and release such Payment in accordance with the terms of the Escrow Agreement. Upon presentation of a confirmation from the lessor that the BIs were delivered to each Plaintiff, Defendants were required to release the Escrow Payments.

25.     Additionally, the Escrow Agreement provided that should the lessor fail to deliver the BIs to each Plaintiff within two (2) international banking days of executing the Escrow Agreements, Defendants would return the Escrow Payments to each Plaintiff upon each Plaintiff's written notice of this failure.

26.     Essentially, the Escrow Agreements detailed transactions in which each respective Plaintiff would obtain a loan through Defendants and a lessor, in exchange for a fee, including the initial Escrow Payment deposited with Defendants.

27.     Defendants failed to secure funding for each Plaintiff's promised loan contemplated in each Escrow Agreement within two (2) international banking days of executing the Escrow Agreements, or thereafter.

28.     Defendants failed to secure the promised loan for any of the Plaintiffs, and furthermore, failed to return any of the Plaintiff's Escrow Payments pursuant to the terms of the Escrow Agreements.

29.     Upon information and belief, upon their receipt of Plaintiffs' respective escrow funds, Defendants almost immediately converted the escrow funds for their own benefit.[3]

A.     **The Plaintiffs' Escrow Agreements**

a.     **NAVCAN.DC, Inc. (previously known as Cascade Divide Data Centers, Inc.) (Plaintiff A)**

30.     On October 29, 2015, Plaintiff A entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline Capital, L.L.C. ("Straightline" or the "Lessor") agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.A, NAVCAN/Cascade Escrow Agreement.*

31.     The Escrow Agreement provided that Plaintiff A would make a partial, initial payment of six hundred thousand dollars ($600,000) (the "Escrow Payment"), three percent (3%) of the face value of the BI, into an escrow account.

32.     Pursuant to the Escrow Agreement, Plaintiff A made the six hundred thousand dollar ($600,000) Escrow Payment to Defendants.

33.     However, Defendants never funded the loan promised to Plaintiff A pursuant to the Escrow Agreement.

34.     Despite Plaintiff A's repeated demands that the Escrow Payment be returned to Plaintiff A, Defendants refused to return the Escrow Payment.

---

[3] In a separate arbitration proceeding between Defendants and another non-party investor, that non-party investor stated in a post-hearing brief that "It is also undisputed that almost one-half of the total Escrow Payment (some $646,000) was, within three days after receipt by CKR, paid by CKR and Rinde to themselves, a fact which had not been disclosed[.]" *See Exhibit 5, Post-Hearing Brief at Pages 2-3.* In the course of the AAA arbitration proceeding between the Parties herein, contrary to the Panel's Order, Defendants refused to produce any documents, including but not limited to CKR's escrow account statements, demonstrating what happened to Plaintiff's escrow funds. Plaintiffs would posit that the only conclusion this Court can reach is that Defendants similarly converted Plaintiff's escrow funds.

### b. DACH Holdings, LLC (Plaintiff B)

35.     On March 23, 2019, Plaintiff B entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff B in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.B, DACH Escrow Agreement.*

36.     The Escrow Agreement provided that Plaintiff B would make a partial, initial payment of four hundred thousand dollars ($400,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

37.     Pursuant to the Escrow Agreement, Plaintiff B made the four hundred thousand dollar ($400,000) Escrow Payment to Defendants.

38.     However, Defendants never funded the loan promised to Plaintiff B pursuant to the Escrow Agreement.

39.     Despite Plaintiff B's repeated demands that the Escrow Payment be returned to Plaintiff B, Defendants refused to return the Escrow Payment.

### c. Silverstein Realty Group, Inc. (Plaintiff C)

40.     On October 22, 2019, Plaintiff C entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby "M-Corp" (the "Lessor") agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff C in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.C, Silverstein Escrow Agreement.*

41.     The Escrow Agreement provided that Plaintiff C would make a partial, initial payment of four hundred thousand dollars ($400,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

42.      Pursuant to the Escrow Agreement, Plaintiff C made the four hundred thousand dollar ($400,000) Escrow Payment to Defendants.

43.      However, Defendants never funded the loan promised to Plaintiff C pursuant to the Escrow Agreement.

44.      Despite Plaintiff C's repeated demands that the Escrow Payment be returned to Plaintiff B, Defendants refused to return the Escrow Payment.

45.      It is undeniable that Defendants knew the transaction to be fraudulent at the time they solicited Plaintiff C to enter into the transaction.

46.      In fact, Defendants had pre-emptively initiated an arbitration proceeding against another investor, with whom Defendants had entered into an identical transaction and whom had also never received funding nor the return of their escrow payment, seeking damages from the investor and a declaratory judgment that Defendants had not breached their escrow agreement with that investor, on March 12, 2019 – seven months prior to Defendants' fraudulent inducement of Plaintiff C into an identical transaction. *See Exhibit 6, JAMS Arbitration Award.*

47.      In that arbitration proceeding, the investor countersued Defendants and eventually obtained an Award[4] in the amount of $1,360,000.00 (the amount of their escrow payment) plus interest for Defendants' fraud. Defendants' frivolous claims in that matter were denied. *See Exhibit 6, JAMS Arbitration Award.*

48.      Defendants never disclosed the existence of this litigation to Plaintiff C when soliciting Plaintiff C to enter into an identical escrow transaction.

---

[4] Pursuant to a Panel Order, Defendants were under a continuing obligation to produce this Award to Plaintiffs in their arbitration proceeding when it was rendered – first as a "Partial Final Award" on December 19, 2022 and then as a Final Award on January 12, 2023 - at least up until the termination of the proceeding on January 14, 2023. Defendants failed to produce the document to Plaintiffs, who obtained it through their own efforts. Defendants' bad-faith failure to produce documents and disobedience of Panel Orders was a consistent trend throughout the arbitration proceeding between the Parties, as will be detailed below.

49.     Plaintiff C additionally retained Defendants to provide legal services in connection with the above-described transaction on July 1, 2019.

50.     Plaintiff C made a retainer payment of twenty five thousand dollars ($25,000.00) to Defendants.

51.     Upon information and belief, Defendants provided no legal services to Plaintiff C.

52.     If Defendants did provide any legal services to Plaintiff C, such services were performed in a negligent manner, and did not result in the successful consummation of the Escrow transaction, a result under the exclusive control of Defendants, despite Plaintiff C fulfilling all of its obligations under the Escrow Agreement.

53.     Despite Plaintiff C's repeated demands that the retainer payment be returned to Plaintiff C, Defendants refused to return the retainer payment.

### d.  Silver Springs Development, Inc. (Plaintiff D)

54.     On February 22, 2018, Plaintiff D entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff D in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.D, Silver Springs Escrow Agreement.*[5]

55.     The Escrow Agreement provided that Plaintiff D would make a partial, initial payment of one million dollars ($1,000,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

56.     Pursuant to the Escrow Agreement, Plaintiff D made the one million dollar ($1,000,000) Escrow Payment to Defendant.

---

[5] The Silver Springs Escrow Agreement was initially executed by non-party Cordella Developments Corp. ("Cordella"). Cordella later assigned any rights, interests, and/or claims it may have had under the Escrow Agreement to Plaintiff D. *See Exhibit 4, Cordella Assignment.*

57.     However, Defendants never funded the loan promised to Plaintiff D pursuant to the Escrow Agreement.

58.     Despite Plaintiff D's repeated demands that the Escrow Payment be returned to Plaintiff D, Defendants refused to return the Escrow Payment.

### e. GGH, Inc. (Plaintiff E)

59.     On June 5, 2018, Plaintiff E entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff E in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.E, GGH Escrow Agreement.*

60.     The Escrow Agreement provided that Plaintiff E would make a partial, initial payment of four hundred fifty thousand dollars ($450,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

61.     Pursuant to the Escrow Agreement, Plaintiff E made the four hundred fifty thousand dollars ($450,000) Escrow Payment to Defendant.

62.     However, Defendants never funded the loan promised to Plaintiff E pursuant to the Escrow Agreement.

63.     Despite Plaintiff E's repeated demands that the Escrow Payment be returned to Plaintiff E, Defendants refused to return the Escrow Payment.

### f. Residencial de Chihuahua 2001, S.A. de C.V. (Plaintiff F)

64.     On April 25, 2017, Plaintiff F entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff F in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.F, Residencial Escrow Agreement.*

65.    The Escrow Agreement provided that Plaintiff F would make a partial, initial payment of one million fifty thousand dollars ($1,050,000) (the "Escrow Payment"), three percent (3%) of the face value of the BI, into an escrow account.

66.    Pursuant to the Escrow Agreement, Plaintiff F made the one million fifty thousand dollars ($1,050,000) Escrow Payment to Defendant.

67.    However, Defendants never funded the loan promised to Plaintiff F pursuant to the Escrow Agreement.

68.    Despite Plaintiff F's repeated demands that the Escrow Payment be returned to Plaintiff F, Defendants refused to return the Escrow Payment.

**B.    Facts Common to All Plaintiffs**

69.    Defendants made the same false representation that they had successfully consummated numerous similarly-structured transactions with numerous prior investors to each Plaintiff, prior to each Plaintiff's agreement to invest escrow funds with Defendants.

70.    Each Plaintiff entered into a virtually identical Escrow Agreement with Defendants and made an escrow payment to Defendants.

71.    Each Plaintiff notified Defendants that they had not received the promised funds.

72.    Each of the Plaintiffs repeatedly complained to Mr. Rinde over the course of several years of the failed transaction, and Mr. Rinde repeatedly informed each of the Claimants of various steps he was allegedly taking to ensure that their promised loans were funded.

73.    Mr. Rinde represented to the Claimants that he was taking an active role in securing their funding, including allegedly communicating with various banks and regulators, foreign and domestic, and even traveling to foreign jurisdictions where their funds were allegedly "held up." Mr. Rinde was the only person Claimants dealt with in this regard.

74.     Mr. Rinde represented repeatedly to Claimants that their promised funds were held in certain accounts but that the transfer of such funds was being held up by the Federal Reserve among other entities, and even provided fraudulent account statements showing large balances to certain of the Claimants.

75.     All of the above representations made by Mr. Rinde to Plaintiffs were false and made with the purpose of continuously concealing the fraudulent nature of the transactions Mr. Rinde induced Plaintiffs to enter into.

76.     To date, Defendants have failed to fund each Plaintiff's promised loan.

77.     To date, Defendants have refused to return the Escrow Payments to each Plaintiff, despite each Plaintiff's repeated demands that Defendants return their funds.

78.     Defendants are thus in breach of their Escrow Agreements with each Plaintiff.

79.     Plaintiff A suffered not less than six hundred thousand dollars ($600,000) in damages as a result of Defendants' illegal conduct, Plaintiff B suffered not less than four hundred thousand dollars ($400,000) in damages as a result of Defendants' illegal conduct, Plaintiff C suffered not less than four hundred thousand dollars ($400,000) in damages as a result of Defendants' illegal conduct, Plaintiff D suffered not less than one million dollars ($1,000,000) in damages as a result of Defendants' illegal conduct, Plaintiff E suffered not less than four hundred fifty thousand dollars ($450,000) in damages as a result of Defendants' illegal conduct, and Plaintiff F suffered not less than one million fifty thousand dollars ($1,050,000) in damages as a result of Defendants' illegal conduct.

## C.    The AAA Arbitration

80.    Pursuant to the Parties' Escrow Agreements, Plaintiff NAVCAN/Cascade initially attempted to resolve this dispute via arbitration by filing a Statement of Claim at the American Arbitration Association (the "AAA") on October 29, 2021.

81.    On January 20, 2022, Plaintiffs filed a First Amended Statement of Claim, adding Plaintiffs DACH, Silverstein, Silver Springs, and GGH as additional claimants in the arbitration.

82.    On February 22, 2022, Plaintiffs filed a Second Amended Statement of Claim, adding Plaintiff Residencial as a sixth Claimant.

83.    On March 10, 2022, Defendants filed an Answer to Plaintiffs' Second Amended Statement of Claim, and asserted a variety of frivolous counterclaims and third-party claims.[6]

84.    Plaintiffs timely paid the initial filing fee and proceed fee required by the AAA, in the total amount of $15,075.00.

85.    On or about April 13, 2022, a Panel of three arbitrators was assigned to the case by the AAA, and the AAA issued an invoice to the Parties for the arbitrators' initial fee deposit in the amount of $8,300.00 for each side.

86.    Plaintiffs promptly paid their share of the arbitrators' initial fee deposit.

87.    On or about May 13, 2022, the Parties participated in an initial pre-hearing conference ("IPHC") with the Panel, and the Panel issued a scheduling Order.

88.    Soon after the IPHC, Plaintiffs learned that Defendants had failed to pay their initial arbitrator deposit.

89.    On or about May 27, 2022, the AAA issued an additional invoice to the parties, in the amount of $44,012.50 for each side, for additional fees incurred by the arbitrators.

---

[6] Among these claims was a laughably absurd claim by Defendants that Plaintiffs fraudulently induced Defendants into accepting and converting Plaintiffs' own escrow funds. Defendants provided no explanation of what damages they possibly could have incurred by this alleged fraudulent inducement into their theft of Plaintiffs' money.

90.     Plaintiffs again timely paid the May 27, 2022 invoice, and Defendants again failed to timely pay the invoice.

91.     As a result of this non-payment, the Panel suspended its scheduling Order, including previously scheduled final hearing dates.

92.     Defendants eventually paid the initial arbitrator deposit and May 27, 2022 invoice, and the Panel held another pre-hearing conference on or about September 6, 2022, and issued another scheduling Order.

93.     After this second pre-hearing conference, Defendants continued to obstruct and delay the arbitration proceeding, refusing to cooperate in discovery and repeatedly disobeying Panel Orders to produce documents and information.

94.     Plaintiffs were forced to make numerous applications to the Panel to attempt to compel Defendants to comply with their discovery obligations, generating significant additional arbitrator fees.

95.     On or about September 22, 2022, the AAA issued another invoice to the Parties for the arbitrators' additional incurred fees in the amount of $31,562.50 for each side.

96.     Plaintiffs promptly paid their share of the amount due, bringing the total arbitration fees paid by Plaintiffs to $98,950.00.

97.     On or about October 31, 2022, the Chairman of the Panel held a discovery conference to address the issues raised by Plaintiffs, during which Plaintiffs again raised the numerous instances of misconduct by Defendants. During this conference, Plaintiffs learned that Defendants had again failed to pay their requisite share of the September 22, 2022 invoice. Defendants represented that they would pay their outstanding amount due in short order.

98.    Following the October 31, 2022 discovery conference, Plaintiffs sent a Letter to the Panel detailing Defendants repeated and continuous misconduct. *See Exhibit 7, Plaintiffs' October 31, 2022 Letter.*

99.    In response to Plaintiffs' October 31, 2022 Letter, on November 2, 2022 the Panel ordered the Parties to submit letter briefs as to what sanctions the Panel should impose against Defendants and/or their Counsel.

100.    Plaintiffs submitted their letter brief in support of sanctions against Defendants and their Counsel on November 9, 2022. *See Exhibit 8, Plaintiffs' November 9, 2022 Letter Brief.*

101.    On or about November 15, 2022, administrators at the AAA held a call with the Parties to discuss the overdue invoice. During the conference, Defendants again represented that they would satisfy the overdue invoice in short order.

102.    However, Defendants continued to withhold payment, and on November 18, 2022 the Panel issued an Order[7] suspending the arbitration because "full deposits were not received from [Defendants]." The Order set a deadline of December 16, 2022 for Defendants to meet their payment obligations. *See Exhibit 9, Suspension Order.*

103.    On December 17, 2022, one day after the deadline for payment imposed by the Panel, Defendants sent a letter to the Panel requesting an extension to meet their payment obligations, while providing no explanation for having missed the Panel's deadline. *See Exhibit 10, Defendants' December 17, 2022 Letter.[8]*

104.    On December 20, 2022, Plaintiffs responded to Defendants' December 17, 2022 Letter, stating that Plaintiffs could not afford to pay Defendants' overdue fees and requesting that

---

[7] The Order was erroneously dated December 17, 2022. The Parties received the Order from the AAA on November 18, 2022.

[8] Defendants dated their Letter December 16, 2022, in an attempt to appear as if they had sent it prior to the passing of the deadline for payment, but did not send the letter until the morning of December 17, 2022, a Saturday.

the Panel decline to credit Defendants' continuing misrepresentations as to payment. *See Exhibit 11, Plaintiffs' December 20, 2022 Letter.*

105.    Plaintiffs further requested that the Panel rule on Plaintiffs' request for sanctions against Defendants.

106.    On January 13, 2023, the Chairman of the Panel issued an Order terminating the arbitration, stating that "despite assurances from [Defendants] that deposits would be made, required [Defendants'} deposits have not been made. Therefore, in accordance with Rule R-57, this arbitration is hereby terminated." The Panel declined to rule on Plaintiffs' request for sanctions prior to terminating the arbitration. *See Exhibit 2, Termination Order.*

107.    Subsequent to the termination, Plaintiffs requested that the AAA provide an estimate of the cost of continuing the arbitration to an Award should Plaintiffs pay Defendants' outstanding amount due.

108.    The AAA advised Plaintiffs that, with the bold assumption that Defendants would be cooperative going forward and no further discovery issues would arise, the total cost to proceed to an Award would be not less than $216,028.75.[9]

109.    Plaintiffs, who had collectively been defrauded of approximately $4,000,000.00 by Defendants, could not afford to pay this amount to continue with the arbitration.

## COUNTS ALLEGED

### COUNT ONE:
### BREACH OF CONTRACT AS TO THE ESCROW PAYMENTS

110.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 109, as if fully set forth herein.

---

[9] The AAA advised that if Respondents continued to behave as they had throughout the proceeding, rather than cooperating, the total fees would be much greater than $216,028.75.

111.    The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.[10]

112.    Each of the Plaintiffs entered into an Escrow Agreement with Defendants, under which Plaintiffs promised to make initial Escrow Payments as described above, to be held in escrow by Defendants in partial consideration for Defendants' procurement of a BI for Plaintiffs' benefit.

113.    Plaintiffs have performed all conditions precedent to bringing this action for breach of contract.

114.    Defendants have breached their contractual relationship with Plaintiffs by failing to return the Escrow Payments to each Plaintiff, despite Plaintiffs' having provided notice of Defendants' failure to procure the BI.

115.    As a result of Defendants' breach of contract, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs

---

[10] See RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC, 156 Fed.Appx. 349, 350--51, 2005 (C.A.2 (N.Y.), 2005).

have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' breach of contract.

## COUNT TWO:
## FRAUD AND FRAUDULENT CONCEALMENT

116.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 115 as if fully set forth herein.

117.    The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.[11]

118.    "Where a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."[12]

119.    Defendants knowingly made material misrepresentations of fact to Plaintiffs when Defendants represented to Plaintiffs that Defendants would hold the Plaintiffs' respective Escrow Payment in trust for Plaintiffs, and return such Escrow Payment to Plaintiff upon Plaintiff's notification to Defendants that Defendants failed to procure a BI for Plaintiff's benefit within two (2) international bank days of the Escrow Agreement's execution.

120.    Defendants in fact intended to convert Plaintiffs' escrow payments for their own benefit and upon receipt of Plaintiffs' escrow payments, Defendants did convert the funds.

121.    Defendants further knowingly made a material misrepresentation of fact to Plaintiffs when Defendants represented to each of the Plaintiffs that Defendants had previously

---

[11] Eprycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979, 883 N.Y.S.2d 147, 150, 12 N.Y.3d 553, 559 [NY, 2009].

[12] N.Y. CPLR § 3016 (McKinney 2018) ("Particularity in specific actions").

successfully executed numerous similarly-structured transactions, and that Defendants would successfully fund Plaintiffs' respective promised loans.

122.     Defendants intended to induce Plaintiffs into executing their respective Escrow Agreements and making their respective Escrow Payments to Defendants by making these representations.

123.     Plaintiffs each did make the Escrow Payments to Defendants in reliance on Defendants' representations.

124.     After Plaintiffs made the Escrow Payments to Defendants, Defendants continued to make misrepresentations to Plaintiffs.

125.     Defendants repeatedly represented to each of the Claimants that Mr. Rinde was taking various steps, including communicating with banks and regulators, and even traveling to foreign jurisdictions, to ensure the funding of their promised loans.

126.     Mr. Rinde repeatedly represented to Claimants that their promised funds were held in certain accounts and that various regulators and banks were holding up their funding.

127.     Defendants' purpose in making these misrepresentations to Claimants was to conceal the fraudulent nature of the transactions Defendants had induced Claimants to enter into.

128.     As a result of Defendants' fraud and fraudulent concealment, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in

an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' fraud.

## COUNT THREE:
## MISREPRESENTATION AND OMISSION

129.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 124 as if fully set forth herein.

130.     A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'[13]

131.     Defendants had a duty to impart correct information to Plaintiffs regarding the terms of the Escrow Agreements executed by the Parties, by which Plaintiffs made Escrow Payments as detailed above in consideration for Defendants' procurement of a loan for Plaintiffs' benefit.

132.     Defendants knowingly or negligently made a material misrepresentation of fact to Plaintiffs when Defendants represented to Plaintiffs that Defendants would either fund Plaintiffs' promised loans or return Plaintiffs' Escrow Payment upon Defendants' failure to fund such loans.

133.     Defendants further knowingly or negligently made a material misrepresentation of fact to Plaintiff when Defendants represented to Plaintiff that Defendants had previously

---

[13] JA.O. Acquisition Corp . Stavitsky, 863 N.E.2d 585, 587, 831 N.Y.S.2d 364, 366, 8 N.Y.3d 144, 148 [NY 2007].

successfully executed numerous similarly-structured transactions, and that Defendants would successfully fund Plaintiffs' loan.

134.    Plaintiffs reasonably relied on this information in making their respective decisions to enter into their respective Escrow Agreements with Defendants.

135.    As a result of Defendants' misrepresentations and omissions, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' misrepresentations and omissions.

## COUNT FOUR:
## BREACH OF THE DUTY OF GOOD FAITH & FAIR DEALING

136.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 131 as if fully set forth herein.

137.    "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the

defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."[14]

138.    As a result of Plaintiffs' respective Escrow Agreement with Defendants, Plaintiffs expected Defendants to act in accordance with the terms of the Escrow Agreements and either fund Plaintiffs' promised loans or return the Escrow Payments to Plaintiffs upon Defendants' failure to do so and Plaintiff's written notice thereof to Defendants.

139.    Defendants withheld a benefit from Plaintiffs when Defendants did not return Plaintiffs' respective Escrow Payments to Plaintiffs upon their failure to fund Plaintiffs' promised loans and Plaintiffs' written notice thereof to Defendants.

140.    As a result of Defendants' breach of their duties of good faith and fair dealing, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' breach of the duty of good faith and fair dealing.

---

[14] Aventine Inv. Management- Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (2d Dep't, 1999).

## COUNT SIX:
## BREACH OF FIDUCIARY DUTY

141.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 136 as if fully set forth herein.

142.    In order to establish a breach of fiduciary duty, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct."[15]

143.    A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship."[16]

144.    Defendants, as Escrow Agent, owed an affirmative duty of care and loyalty to their escrow beneficiaries.[17]

145.    Defendants also owed an affirmative duty of care and loyalty to Plaintiff Silverstein, as Plaintiff Silverstein's retained counsel in relation to the escrow transaction between Defendants and Plaintiff Silverstein.

146.    Defendants knew or should have known that Plaintiffs had placed their complete trust and confidence in Defendants to provide accurate information in regard to the transaction Defendants solicited Plaintiff to enter into and to properly handle their escrow funds.

147.    Defendants breached their fiduciary duty to Plaintiffs under applicable state and federal securities laws and exchange rules in a reckless, willful, and wanton manner and with

---

[15]    Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dep't, 2007).
[16]    EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 832 N.E.2d 26 [N.Y. 2011] (citing Restatement [Second] of Torts § 874, Comment a.).
[17]    Baquerizo v Monasterio, 90 AD3d 587 [2d Dept 2011] ("An attorney holding funds in escrow owes a fiduciary duty "to 'anyone with a beneficial interest in the trust'")

total disregard for the legal and fiduciary rights of Plaintiff, by fraudulently inducing Plaintiffs to make escrow payments to Defendants and converting their funds.

148.    As a result of Defendants' breach of fiduciary duty, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' breach of fiduciary duty.

## COUNT SEVEN:
## CONVERSION

149.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 144 as if fully set forth herein.

150.    "To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."[18]

---

[18]    Neely v. Residential Mortg. Solution, LLC, 2015 WL 6438772, at *4 (E.D.N.Y. 2015).

151.    Here, the property subject to conversion is each of Plaintiffs' respective Escrow Payments.

152.    Plaintiffs had ownership and control over the funds comprising each of Plaintiffs' respective Escrow Payments before Defendants' conversion of such funds.

153.    Defendants exercised an unauthorized dominion over each Escrow Payment when Defendants failed to return the Escrow Payments to Plaintiffs, despite Defendants' failure to fund Plaintiffs' promised loans and Plaintiffs' written notice to Defendants thereof.

154.    As a result of Defendants' conversion, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' conversion.

### COUNT SEVEN:
### UNJUST ENRICHMENT

155.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 150 as if fully set forth herein.

156.    An unjust enrichment claim requires that plaintiff shows "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."[19]

157.    The essence of an unjust enrichment claim is "an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it."[20]

158.    Defendants were enriched by retaining Plaintiffs' respective Escrow Payments after failing to fund the loans promised to Plaintiffs.

159.    Defendants were enriched at Plaintiffs' expense because as a result Defendants' failure to return the Escrow Payments to Plaintiffs, Plaintiffs were deprived of the funds constituting their Escrow Payments.

160.    It is against equity and good conscience to permit Defendants to retain the Escrow Payments because Defendants had an obligation to return the Escrow Payments to Plaintiffs upon Defendants' failure to fund the loans promised to Plaintiffs.

161.    As a result of Defendants' unjust enrichment, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars

---

[19] Mandarin Trading v. Wildenstein, 16 N.Y.3d 173 (N.Y. 2011), at 182.

[20] Saunders v. Klein, 55 A.D.2d 887 (1st Dep't. 1977), at 888.

($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' unjust enrichment.

## COUNT EIGHT:
## BREACH OF THE RETAINER AGREEMENT AS TO PLAINTIFF SILVERSTEIN REALTY GROUP, INC.

162.    Plaintiff Silverstein re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 157, as if fully set forth herein.

163.    The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.[21]

164.    Plaintiff Silverstein entered into a Retainer Agreement with Defendants, by which Defendants promised to provide legal services in connection with the loan transaction between Plaintiff Silverstein and Defendants in exchange for a retainer payment of $25,000.00.

165.    Plaintiff Silverstein has performed all conditions precedent to bringing this action for breach of contract.

166.    Defendants have breached their contractual relationship with Plaintiff Silverstein by failing to provide any legal services to Plaintiff Silverstein in connection to the loan

---

[21] See RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC, I56 Fed.Appx. 349, 350--51, 2005 (C.A.2 (N.Y.), 2005).

transaction between Plaintiff Silverstein and Defendants and subsequently refusing to return the retainer payment to Plaintiff Silverstein despite his demand that the retainer payment be returned.

167.    Any legal services that may have been performed by Defendants pursuant to the retainer agreement were performed negligently, as evidenced by Defendants' failure to secure the promised loan or return Plaintiff Silverstein's escrow payment, despite such outcomes having been in Defendants' exclusive control.

168.    As a result of Defendants' breach of contract, Plaintiff Silverstein has been damaged in an amount not yet fully ascertained but believed to be in excess of twenty-five thousand dollars ($25,000.00).

## COUNT NINE:
## BREACH OF CONTRACT AS TO THE ARBITRATION AGREEMENT

169.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 164 as if fully set forth herein.

170.    The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.[22]

171.    Each of the Plaintiffs entered into an Escrow Agreement with Defendants, under which the Parties agreed to arbitrate any dispute arising from the Escrow Agreement.

172.    Plaintiffs have performed all conditions precedent to bringing this action for breach of contract.

---

[22] See RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC, I56 Fed.Appx. 349, 350--51, 2005 (C.A.2 (N.Y.), 2005).

28

173.   Defendants have breached their contractual relationship with Plaintiffs by failing to arbitrate the instant dispute in good faith, and intentionally derailing the AAA arbitration proceeding by refusing to pay their requisite share of arbitrators' fees.

174.   Defendants' consistent pattern of misconduct throughout the AAA arbitration proceeding generated significant arbitrators' fees for Plaintiffs that should have been unnecessary, and delayed resolution of the instant dispute by years.

175.   As a result of Defendants' breach of contract, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of ninety eight thousand nine hundred fifty dollars ($98,950.00).

## COMPENSATORY DAMAGES, INTEREST, PUNITIVE DAMAGES, AND ATTORNEYS' FEES

176.   For all of the foregoing reasons, this Court should award compensatory damages in an amount to be determined at arbitration but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred twenty five thousand dollars ($425,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, the Arbitrator should award compensatory damages to Plaintiffs in an amount to be determined at trial but not less than three million nine hundred twenty five thousand dollars ($3,925,000.00).

177.   The Court should additionally award Plaintiffs compensatory damages in the amount of ninety eight thousand nine hundred fifty dollars ($98,950.00) for their losses incurred as a result of Defendants' misconduct in the AAA arbitration proceeding.

178.    The Court should additionally award each Plaintiff interest accrued at the New York State statutory rate of nine percent (9%) per annum from the date each respective Escrow Agreement was breached by Defendants until the date of payment pursuant to CPLR § 5004.[23]

179.    The Court should additionally award each Plaintiff its respective attorneys' fees pursuant to Section 5(c) of each respective Escrow Agreement, which provides the Court authority to award attorneys' fees in connection with disputes arising from the Escrow Agreements. *See Exhibits 3.A-F, at Section 5(c).*

180.    The Court should additionally award each punitive damages to each Plaintiff.

181.    Under New York law, punitive damages are "appropriate in cases involving gross, wanton, or willful fraud or other morally culpable conduct."[24]

182.    Here, Defendants willfully defrauded each of the Plaintiffs employing an identical scheme and making use of identical Escrow Agreements from 2015 through 2019 as detailed above.

183.    Defendants continued to defraud new investors even after Defendants were unable to consummate the earlier loan transactions, and refused to return the Escrow Payments they obtained through fraud to any of the Plaintiffs.

184.    Defendants further intentionally obstructed, delayed, and eventually caused to be terminated the AAA arbitration proceeding in which Plaintiffs initially attempted in good faith to resolve this dispute.

185.    Defendants' conduct towards Plaintiffs rises to the level of morally culpable conduct that punitive damages are intended to deter.

---

[23] "Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." *CPLR § 5004.*

[24] Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 376 F. Supp. 2d 385, 412 (S.D.N.Y. 2005).

186.    As a result of Defendants' willful fraud and subsequent misconduct in the AAA arbitration proceeding, Plaintiffs request punitive damages be awarded in an amount not less than three times the compensatory damages awarded to each respective Plaintiff, along with attorney's fees and interest.

**WHEREFORE,** Plaintiff requests the following relief:

a. On the First Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

b. On the Second Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

c. On the Third Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A,

four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

d. On the Fourth Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial but not less than three million nine hundred thousand dollars ($3,900,000.00);

e. On the Fifth Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

f.  On the Sixth Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

g.  On the Seventh Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

h.  On the Eighth Count, awarding compensatory damages to Plaintiff C in an amount to be determined at trial, but not less than twenty five thousand dollars ($25,000.00);

i.  On the Ninth Count, awarding compensatory damages to Plaintiffs in an amount to be determined at trial, but not less than ninety eight thousand nine hundred fifty dollars ($98,950.00)

j.  As to all Counts, awarding punitive damages in an amount not less than three times compensatory damages to each Plaintiff;

k.  As to all Counts, awarding each Plaintiff their respective reasonable attorneys' fees and costs;

l.  As to all Counts, awarding interest accruing from the date of the breach;

m.  As to all Counts, awarding Plaintiffs' compensatory damages totaling an amount in excess of four million twenty three thousand nine hundred fifty dollars ($4,023,950.00) plus interest, costs, reasonable attorneys' fees and punitive damages;

n.  As to all Counts, awarding such other and further relief as the Court deems just and fair.

Dated: New York, New York
       March 16, 2023

                                    Respectfully Submitted,

                                    Kevin P. Conway, Esq. (6946)
                                    Conway & Conway
                                    *Attorneys for Plaintiffs*
                                    99 Park Avenue, 6th Floor
                                    New York, NY 10016
                                    (212) 938-1080
                                    kpc@conway-conway.com